NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0419n.06

No. 10-3358

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

*Jun 28, 2011*

LEONARD GREEN, Clerk

RUDOLPH ALEXANDER, )
)
    Plaintiff-Appellant, )
)
v. ) On Appeal from the United States
) District Court for the Southern
OHIO STATE UNIVERSITY COLLEGE OF ) District of Ohio
SOCIAL WORK, ET AL., )
)
    Defendants-Appellees. )

Before:     BOGGS and KETHLEDGE, Circuit Judges; and COLLIER, District Judge[*]

PER CURIAM. Plaintiff Dr. Rudolph Alexander sued The Ohio State University

("OSU"); the OSU College of Social Work ("the College"); OSU's Associate Vice President for

Human Resources; and the College's dean (collectively "Defendants") for race discrimination and

retaliation, in violation of Title VII, 42 U.S.C. §§ 2000e-2(a)(1) and 2000e-3(a), and violation of the

Equal Protection Clause of the Fourteenth Amendment, under 42 U.S.C. § 1983.[1] Alexander claims

that Defendants forced him to resign as Director of the College's undergraduate program and gave

---

[*]The Honorable Judge Curtis L. Collier, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

[1]Because liability for discrimination under 42 U.S.C. § 1983 is coterminous with liability under Title VII when a plaintiff alleges disparate treatment by a state employer, *Grano v. Dep't of Dev. of Columbus*, 637 F.2d 1073, 1082 (6th Cir. 1980), our analysis of Alexander's Title VII claims applies to his § 1983 discrimination claims.

him poor evaluations and small pay raises because of his race and in retaliation for protected activity, and that the dean filed a retaliatory internal complaint against him. He also claims that he was denied due process because he was not timely provided with requested public records. Alexander challenges the district court's grant of summary judgment to Defendants on all of his claims. He further argues that the court abused its discretion in failing to rule on his motion to compel discovery of the dean's computer hard drives.

We first hold that the district court did not abuse its discretion in denying Alexander's discovery motion. Second, we affirm the grant of summary judgment to Defendants on Alexander's discrimination and retaliation claims because, with respect to each claim, Alexander has either failed to make out a prima facie case or failed to show that Defendants' proffered reasons for their actions were pretextual. Finally, we affirm the grant of summary judgment for Defendants on Alexander's due process claim, because he was not denied meaningful access to the courts.

I

Alexander is an African-American tenured professor of Social Work. He joined the College as an assistant professor in 1989 and was awarded tenure in 1995. He was appointed Director of the College's Bachelor of Science and Social Work ("BSSW") Program in 2000. Shortly after the College hired a new dean in 2005, Alexander raised concerns about the dean's suggestion that students sign a pledge to support the National Association of Social Workers' Code of Ethics, which includes a statement that social workers should not discriminate on the basis of sexual orientation. Alexander told the dean in July 2005 that requiring religious students to "accept[] homosexuality"

might be a civil-rights violation. Alexander then attempted to investigate possible pay inequities in the College, suspecting he might be a victim of sex discrimination. In late August 2005, he requested records of faculty salaries, a request that, according to Alexander, "upset" the dean.

Alexander alleges that the dean began engaging in race discrimination and retaliation against him in March 2006, when he was asked to step down as BSSW Director. Then, as a result of his May 2006 annual evaluation, he received the smallest raise among the College's professors. Alexander wrote the dean an email on July 3, 2006, contending that, in conducting the evaluations, the dean "divided the faculty into those [he] perceived to be supportive of [him] and those [he] believe[d] not to be supportive," favoring the perceived supporters.

In September 2006, Alexander requested the results of an anonymous survey of College faculty conducted by the Office of Human Resources. He believed the responses might reveal evidence of discrimination and intimidation by the dean. OSU's Associate Vice President for Human Resources informed him that the original surveys had been destroyed. Alexander was later given the aggregated results, and he eventually received, during the course of this litigation, a spreadsheet of the individual responses. Alexander contends, however, that the data was altered.

On September 4 and 14, 2006, Alexander complained to the OSU Provost's Office that the dean was engaging in racial discrimination and was biased toward homosexuals. OSU's Human Resources department received the complaint and issued a finding on December 19, 2006, that no discrimination occurred. On December 1, 2006, Alexander filed a charge of discrimination with the Ohio Civil Rights Commission ("OCRC") and the Equal Employment Opportunity Commission ("EEOC"), alleging that his raise in 2006 discriminated against him based on sex and race and in

retaliation for requesting public records. On December 2, 2006, Alexander sent an email to the Associate Vice President for Human Resources and OSU's legal counsel calling the dean a liar and saying, "Every time I see [him], I want to punch him in the face and this is putting it mildly."

Alexander alleges that further discrimination and retaliation occurred when, in 2007, the College issued special one-time merit-based salary adjustments. Alexander's raise—one of the smallest in the College—was based on a merit rating determined by a committee comprised of the dean and three professors. Alexander contends that his merit rating was discriminatory because he was not given the highest possible score for scholarship by any committee member. He also alleges that two committee members, who were also full professors, rated him poorly so as to increase their own salaries because all full professors were allocated raises from a fixed pool. On April 3, 2007, Alexander filed another charge with the OCRC and the EEOC, claiming that the 2007 salary adjustment discriminated against him on the basis of race and was retaliatory.

Alexander also claims that he was given no annual raise in 2007 because of discrimination and retaliation. Alexander failed to submit a dossier, which—according to the University's Policies and Procedures Handbook—was required to receive a raise. He contends, however, that he did not wish to have the dean evaluate him and that his request for an alternative evaluator should have been granted, even though it was made after the dossier-submission deadline.

In 2007, Alexander sent emails and a memorandum to the dean and several OSU administrators calling the dean a liar and accusing him of racism. Alexander showed his students a slide displaying the College faculty's names, races, and salaries, claiming that his salary was an

example of racism. In class, he referred to the dean as "gay" and a "leprechaun." He also told at least two OSU faculty that the dean had AIDS and intimidated faculty by "getting in people's faces."

The dean filed a complaint against Alexander with OSU's Human Resources office on March 5, 2008, alleging that Alexander had harassed him based on his sexual orientation. The office issued a report on January 30, 2009, finding that Alexander had engaged in unprofessional conduct and threatening him with disciplinary action if such conduct continued.

Alexander filed this suit against Defendants for race discrimination and retaliation on October 26, 2007, subsequently amending his complaint to include allegations that OSU destroyed public records in violation of the Due Process Clause and § 1983, and that the dean's internal complaint was made in retaliation for Alexander's protected activity in filing this suit. During discovery, Alexander requested copies of any emails sent by the dean referencing Alexander. Alexander believed that some emails were not produced and filed a motion to compel the "mirror imaging" of the dean's computer hard drives in order to look for any emails that might have been deleted. The district court granted summary judgment for Defendants on March 12, 2010, declaring the Motion to Compel "moot." Alexander timely appealed.

II

We review de novo a district court's order granting summary judgment. *Sullivan v. Oregon Ford, Inc.*, 559 F.3d 594, 594 (6th Cir. 2009). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file demonstrate "that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a). In reviewing the decision, we view all evidence in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If the defendant successfully demonstrates, after a reasonable period of discovery, that the plaintiff cannot produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment is appropriate." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

### A.  Alexander's Motion to Compel Discovery

Alexander claims that the district court erred in failing to rule on his motion to compel the "mirror imaging" of the dean's hard drives. By declaring the motion "moot," the court effectively denied it. We review a district court's ruling on a discovery matter for abuse of discretion, *Audi AG v. D'Amato*, 469 F.3d 534, 541 (6th Cir. 2006), reversing only if the court committed "a clear error of judgment, such as applying the incorrect legal standard, misapplying the correct legal standard, or relying upon clearly erroneous findings of fact." *Jones v. Ill. Cent. R.R. Co.*, 617 F.3d 843, 850 (6th Cir. 2010).

Here, the district court made no clear error of judgment. A party may move for an order compelling discovery if the opposing party fails to make a disclosure required by Federal Rule of Civil Procedure 26(a). Fed. R. Civ. P. 37(a)(3)(B). In response to Alexander's discovery request, the dean searched his email account and produced numerous emails. The district court ordered Alexander to produce evidence, in support of his motion, that relevant emails were missing and could be recovered by cloning the dean's hard drives. Alexander responded by contending that the

dean did not write down the specific search terms used and admitted deleting emails, and that Defendants failed to produce an email the dean sent to *him*. Defendants countered that any deleted emails were spam or mass mailings, and that if the allegedly-missing email in fact existed, Alexander would have a copy of it. We conclude that the district court did not rely on clearly erroneous findings of fact in holding that Defendants complied with Rule 26(a), and that it did not abuse its discretion by denying Alexander's motion to compel.

## B. Alexander's Race Discrimination Claims

Claims of race discrimination are evaluated under the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–05 (1973). To proceed on his race-discrimination claim, Alexander must establish a prima facie case of discrimination by showing that "'(1) he . . . was a member of a protected class; (2) he . . . suffered an adverse employment action; (3) he . . . was qualified for the position; and (4) he . . . was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees.'" *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006). If a plaintiff makes out a prima facie case, the burden shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse action. *McDonnell Douglas*, 411 U.S. at 802–03. Once a defendant does so, the plaintiff must produce evidence showing that the proffered reason is pretextual. *Id.* at 804. Pretext may be demonstrated by showing by a preponderance of the evidence "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate [the action], or (3) that they were insufficient to motivate

[the action]." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994) (emphasis omitted).

Alexander claims that he was discriminated against because of his race when he was: (1) replaced as BSSW Director; (2) given a low annual raise in 2006; (3) given a low 2007 special salary adjustment; and (4) given no annual raise in 2007. With respect to each of these claims, Alexander has failed to make out a prima facie case or has offered insufficient evidence to allow a reasonable fact-finder to conclude that the legitimate non-discriminatory reasons proffered by Defendants for these actions were pretexts for race discrimination.

### 1. Replacement as BSSW Director

Alexander was replaced as BSSW Director by an African-American female professor. He cannot establish a prima facie case of discrimination because he was not "replaced by someone outside the protected class." *Wright*, 455 F.3d at 707. Alexander argues that the dean replaced him with an African American in order to foil his lawsuit. But he presents no evidence to support this assertion, and we see no reason to depart from the *McDonnell Douglas* analysis.

### 2. The 2006 Annual Raise

Alexander's 2006 raise was based on his 2005–06 annual evaluation, conducted by the dean. For College administrators, of which Alexander was one of three, the dean assigned weights of 50% for administrative work and a combined 50% for scholarship, teaching, and service. Non-administrative faculty were evaluated only on the latter categories. Faculty received ratings ranging from "no merit" to "extra merit" in each category. Alexander was rated "merit" for scholarship,

teaching, and service and "partial merit" for administration. The percentage raise that resulted was the smallest in the College.

Alexander has failed to make out a prima facie case with respect to the 2006 raise. He has not demonstrated that he was treated differently from similarly-situated faculty. The district court found that Alexander was similarly situated only to the other administrative faculty, and concluded that he failed to present evidence that he was evaluated differently than the other two professors in the College who served as administrators. Alexander's small raise resulted primarily from his poor rating for administration, and Defendants offered various reasons—which we discuss below—that the dean was unhappy with Alexander's performance as BSSW Director.

Non-administrative faculty may be considered similarly situated to Alexander for the purposes of assessing his ratings for scholarship, teaching, and service, but he has also failed to show that he was treated differently from those faculty. Alexander argues that his scores in these categories should have been higher, pointing to a number of reasons he felt that the dean evaluated certain white faculty more favorably. But his assertions of differential treatment essentially amount to disagreement with the dean's choice of criteria. For example, Alexander contends that the dean should not have relied on his below-average student evaluation scores in assessing his teaching, should have credited him for developing a new course even though he submitted no reading list or syllabus for the course as part of his dossier, and should have given him more service credit for serving on committees, even though such service was required of the BSSW Director. In sum, Alexander has not established that the evaluation criteria were applied differently to him than to non-African-American faculty. Moreover, he has not demonstrated that, even were he awarded the

additional credits he feels he deserved, his performance in scholarship, teaching, and service would entitle him to a rating higher than "merit."

### 3. The 2007 Special Salary Adjustment

Alexander next alleges that he suffered discrimination when he received only a small special salary adjustment in 2007. Here, too, he fails to make out a prima facie case by showing that he was treated differently from similarly situated faculty. He has presented no evidence that the panel applied the evaluation criteria differently to him than to the other full professors with whom his scores were compared to determine his raise. Rather, he disagrees with the decision to award lower-ranking faculty higher percentage raises than senior faculty because the former's salaries lagged further behind those at other institutions. Alexander also contends that he deserved the highest possible rating for scholarship, which no panel member gave him. But he has not demonstrated that other full professors received higher ratings for equally worthy scholarship. Finally, Alexander alleges that two panel members rated him poorly in order to allocate themselves a greater share of the pool reserved for full professors. This, however, cuts against his claim that the size of his raise was the product of racial discrimination.

### 4. The 2007 Annual Raise

Alexander submitted no dossier for the 2006–07 academic year. As a result, he received no raise. This was in accordance with the policy stated in the University's Handbook. Alexander points out that his request for a late review by someone other than the dean was denied, contending that, in this respect, he was treated differently from another professor whose request for a different

evaluator was granted. But he has not demonstrated that the other professor was similarly situated to him, because he presented no evidence that she too failed to submit a dossier on time. Thus, Alexander cannot establish a prima facie case of discrimination with respect to the 2007 raise.

## C. Alexander's Retaliation Claims

Title VII prohibits an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). We analyze Alexander's retaliation claim under the *McDonnell Douglas* framework. A prima facie case of retaliation requires Alexander to "establish that (1) he . . . engaged in protected activity, (2) the employer knew of the exercise of the protected right, (3) an adverse employment action was subsequently taken against [him], and (4) there was a causal connection between the protected activity and the adverse employment action." *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008). To establish causation, Alexander must "proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (internal citations and quotation marks omitted). If he meets this showing, the burden shifts to Defendants to "articulate some legitimate, nondiscriminatory reason" for the action. *McDonnell Douglas*, 411 U.S. at 802. If they do so, Alexander must "demonstrate by a preponderance of the evidence that the proffered reason was a mere pretext for [retaliation]." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003).

### 1. Removal as BSSW Director

Alexander alleges that he was removed as BSSW Director in retaliation for requesting salary information that might reveal sex discrimination. We assume without deciding that this request constituted protected activity. *See Niswander*, 529 F.3d at 719–20, 725 (stating that Title VII's opposition clause protects an employee's "reasonable" opposition to unlawful discrimination).

Defendants give various reasons for Alexander's removal from the position, citing his lack of progress in developing an undergraduate honors program, a social justice minor, and new courses, tasks that Alexander acknowledges were priorities for the dean. Alexander argues that these reasons were pretextual and challenges the Dean's judgment that he was an ineffective administrator. He contends that he missed no required deadlines and was given no written warning of performance problems. He also argues that the dean gave "shifting reasons" for Alexander's dismissal—further evidence that those reasons were pretextual. *See Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.").

Alexander has failed to raise an issue of material fact as to whether the proffered reasons for his removal were a pretext for retaliation. He has not shown that they "had no basis in fact," "did not actually motivate" the dean's decision, or were "not sufficient to motivate" that decision. *Manzer*, 29 F.3d at 1084. Rather, his own deposition testimony indicates that he had made little progress on the dean's prioritized tasks at the time of his removal. Although Alexander was given no written warning, the University Handbook does not indicate that prior written warning is required before removing a professor from an administrative position. Alexander's "shifting reasons"

argument also fails. The fact that a defendant offers "shifting justifications" for an adverse employment action may sometimes be evidence of pretext. *Cicero*, 280 F.3d at 592. "When the justification for an adverse employment action changes during litigation, that inconsistency raises an issue whether the proffered reason truly motivated the defendants' decision." *Ibid*. But an inference of pretext is not warranted here. At the time of Alexander's removal, the dean cited his failure to make progress on the prioritized tasks as the reason he was being replaced. In his deposition, the dean listed a litany of additional reasons for his dissatisfaction with Alexander's performance as BSSW Director. Even so, the dean consistently emphasized Alexander's failure to make progress on the tasks. In other words, the proffered reasons did not change during the course of this litigation.

## 2. The 2006 and 2007 Evaluations

Alexander contends that he received a poor annual evaluation in 2006 in retaliation for opposing the dean's suggestion that students sign a pledge not to discriminate on the basis of sexual orientation and for requesting information regarding faculty salaries. He asserts that he was given only a small 2007 salary adjustment in retaliation for filing an EEOC charge in December 2006.

With respect to the 2006 evaluation, Alexander has failed to establish a prima facie case of retaliation because he has not "proffer[ed] evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." *Avery Dennison Corp.*, 104 F.3d at 861. Retaliation may be inferred from "temporal proximity" if "an adverse employment action occurs very close in time after an employer learns of a protected activity." *Mickey v. Zeidler Tool*

*& Die Co*., 516 F.3d 516, 525 (6th Cir. 2008). "But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Ibid*. Here, Alexander's alleged protected activity occurred in July and August of 2005. His 2005–06 annual evaluation did not occur until May 2006. This court has held that an inference of retaliation may be established based on temporal proximity of two or three months. *See Sanford v. Main St. Baptist Church Manor, Inc*., 327 F. App'x 587, 600–01 (6th Cir. 2009) (two months); *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 556 (2004) (three months). The nine-month gap here is too long to permit the inference, absent some other evidence. That additional evidence of retaliatory conduct could include more favorable treatment of similarly-situated professors who did not engage in protected activity. *See Hill v. Air Tran Airways*, 2011 WL 1042178, at *3 (6th Cir. March 23, 2011). As discussed above, however, Alexander has not demonstrated that he was treated differently from other faculty during the 2006 evaluation.

With respect to the 2007 evaluation, Alexander has failed to raise an issue of fact as to whether the reasons Defendants supplied for Alexander's low raise were pretextual. *See Abbott*, 348 F.3d at 542. As previously discussed, he has not demonstrated that he was treated differently from other full professors, nor has he established that he deserved a better evaluation.

### 3. Dean Meezan's Internal Complaint

Alexander contends that Dean Meezan filed an internal complaint against him in retaliation for filing charges with the EEOC. The district court held that Alexander failed to establish a prima

facie case of retaliation with respect to Dean Meezan's complaint, because the complaint did not constitute an adverse employment action.

The scope of Title VII's retaliation provision is broader than that of the discrimination provision and protects employees from any actions that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quotation marks and citations omitted). A plaintiff must show that the action was "materially adverse" from the standpoint of a "reasonable employee." *Id.* at 68–69. The Supreme Court has limited "adverse employment actions" to something more than "petty slights, minor annoyances, and simple lack of good manners." *Id.* at 68.

We assume without deciding that the lodging of a complaint to OSU's Human Resources Office can constitute a "materially adverse" employment action. We nonetheless affirm the district court's grant of summary judgment to defendants on this claim because Alexander has presented no evidence that the dean's proffered motive for filing the complaint was a pretext for retaliation. Based on facts that Alexander admitted in his deposition, the dean had a legitimate, non-retaliatory reason for filing a complaint alleging that Alexander was harassing him based on his sexual orientation and HIV-positive status. Alexander told a classroom of students that the dean was racist, gay, and a "leprechaun." Alexander also told a provost and a fellow professor that the dean had AIDS and that people feared he "might accidentally head butt them or scratch their faces." He sent emails to university administrators and faculty calling the dean a racist and a liar who favored gay and white faculty members. These undisputed facts were sufficient to motivate the dean's

actions—the dean had the right to seek assistance from OSU in preserving his reputation and keeping his health condition private.

### D. Alexander's Due Process Claim

Finally, we address Alexander's allegation that his right to due process of law was violated by Defendants' alleged failure to provide him with the responses to the faculty survey. To prevail on a due process claim under § 1983, Alexander must show that, by delaying in providing him with the survey responses, Defendants, who were state actors, denied him meaningful access to the courts by concealing evidence crucial to his case. *See Swekel v. City of River Rouge*, 119 F.3d 1259, 1263–64 (6th Cir. 1997).

Defendants did not deny Alexander meaningful access to the courts. He was not prevented from filing this lawsuit. He was provided with the survey results he requested while this action was before the district court. Alexander contends that the responses to the survey were not genuine, but his only evidence of such fraud is that he was initially informed that there were 31 respondents, when the data included 33, and that the data were re-formatted into a spreadsheet. He admits that the results supplied no evidence of use in this suit. Alexander has presented no evidence that Defendants' failure to swiftly provide him with the survey results prevented him from obtaining an effective remedy through this litigation. *See id.* at 1264. Defendants are therefore entitled to summary judgment on Alexander's due process claim.

### III

We AFFIRM the district court's grant of summary judgment for Defendants.