NOT RECOMMENDED FOR PUBLICATION
File Name: 17a0343n.06

No. 16-1722

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jun 19, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NANCY ROSCHIVAL, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| HURLEY MEDICAL CENTER; MELANY | ) | COURT FOR THE EASTERN |
| GAVULIC, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

BEFORE: MOORE, SUTTON, and WHITE, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Plaintiff-Appellant Nancy Roschival, a White female, worked at Hurley Medical Center (HMC), a public hospital owned by the City of Flint, Michigan. After she was laid off pursuant to a reduction in force (RIF), she filed this action asserting a 42 U.S.C. § 1983 claim against Melany Gavulic, the chief executive officer of HMC (also White), alleging that Gavulic's decision to lay her off, rather than an African-American male coworker, was made on the basis of race. In her amended complaint, Roschival added HMC as a defendant with respect to new counts, against both Gavulic and HMC, for wrongful discharge under Michigan common law and racial discrimination under Michigan's Elliott-Larsen Civil Rights Act.

After discovery, Defendants moved for summary judgment. The district court found that Roschival failed to show that Gavulic's nondiscriminatory reason for laying her off was pretext for racial discrimination and granted Gavulic summary judgment as to the § 1983 claim. It

declined to exercise supplemental jurisdiction over the remaining state-law claims and dismissed them without prejudice.

Accepting arguendo that Roschival established a prima facie case of racial discrimination, she failed to meet her burden of showing that Gavulic's proffered legitimate, nondiscriminatory reason for laying her off was a pretext for discrimination. For that reason, we **AFFIRM**.

## I

## A

Roschival began working in HMC's human-resources department (HR) in 1995. For the majority of her time there, she was responsible for processing workers' compensation claims in the Employee Health Office (EHO), a unit affiliated with HR that provided occupational-health services to HMC employees. Her job title was "Service Center Advisor."

Between fall 2013 and summer 2014, HMC reorganized and eventually closed the EHO: its functions were transferred to outside contractors and a new startup subsidiary, Hurley Health Services (HHS). As a result of this reorganization, EHO's staff was largely laid off. In September 2013, Colleen Mansour, interim senior administrator within HR, informed Roschival that her position as Service Center Advisor was being eliminated and that she would be transferred to a position in HR.

After the transfer, Roschival was assigned the job title "Human Resources Coordinator I" (HRC1), but her duties remained essentially the same and she continued to process workers' compensation claims (although HMC had begun to outsource this work to a contractor). Jamal Dozier (Dozier), an African-American man with fewer years' seniority than Roschival, also worked in HR as "Human Resources Coordinator" (HRC). Dozier was responsible for employee

orientation and other HR activities, but was never involved in workers' compensation claims. Roschival and Dozier were the only employees with the HRC1 and HRC job titles.

**B**

HMC closed the EHO completely on August 4, 2014 and transferred the remaining workers' compensation duties handled by Roschival to its outside contractor. As a result of this reorganization, Roschival received a layoff notice on July 31, 2014, signed by Gavulic. (*Id.*) The notice stated that Roschival's employment would be terminated effective August 14, 2013 because "a decision has been made to close the [EHO] and utilize the Occupational Medicine Services through [HHS]." Term. Lett., R. 23-17, PID 326. In making this layoff decision, Gavulic followed the recommendation of Deidra Roriex–an African-American woman and HR generalist–that Roschival was the only person in her job classification and was thus the appropriate employee to lay off based on HMC's reduction-in-force (RIF) procedures.[1]

Many HMC employees belong to labor unions. The others, including Roschival and Dozier, are non-union employees. Layoffs of union members are governed by collective-bargaining agreements, while layoffs of non-union employees are governed by HMC's exempt-employee handbook. The parties disagree whether Gavulic and Roriex followed HMC's RIF policy in laying Roschival off rather than Dozier. The handbook states in pertinent part:

> For incidences of reduction in the work force, management reserves the right to determine the classifications and departments in which layoffs will occur. Recalls will be made in reverse order of layoffs within classification and department. . . . Layoffs or status reductions within classifications and department are made in reverse order of seniority within classification and department. . . . Handbook, R. 23-7, PID 244.

---

[1] Gavulic explained in her deposition: "I was not clear on how [the layoff resulting from the EHO closure] would be transacted. All I knew is there would no longer be work in the [EHO] for what Nancy was doing and there would be an impact so I was seeking HR's role in how that would be handled." Gavulic Dep., R. 23-6, PID 231.

The parties dispute what "classification" means under the policy and whether it includes the concept of a job series, such as Technician, Technician I, Technician II, and so on.[2] Roschival argues that her HRC1 position was within the same classification series as Dozier's. If she is correct, then because she had seniority she should have been allowed to "bump" Dozier (i.e., take his position while he was laid off). HMC and Gavulic assert that HRC1 and HRC were separate classifications, and that they had discretion to eliminate the HRC1 position in connection with the EHO closure rather than the HRC position. If theirs is the correct view, then because plaintiff was the only employee in her classification, she was the only employee to lay off.

Roschival deposed former HR employees to develop factual support for her view that the proper RIF procedure was not followed.

Rebecca Jackson, HMC's assistant director of HR operations from January 2001 to October 2010 (four years before the layoff), testified that "classification[]" "includ[es] their job title, their pay grade, their multi-code, their job code . . . ." Jackson Dep., R. 23-10, PID 303. She also testified that a classification might contain a job series, such as Nurse, Nurse I, Nurse II, and so on. Jackson explained that identifying a series requires "look[ing] back at the job description[s], and the MER's [(minimum entrance requirements)]" because a job series has progressive job requirements such that a senior role encompasses the requirements of all junior roles. *Id.* at PID 302.

Lisa Foster, who was employed at HMC as assistant HR director from July 1995 to July 2010, and who trained Roriex on conducting layoffs, also testified regarding "series" within a job classification. Foster described a series as "jobs within a job," i.e., that jobs in a series are all

---

[2] The concept of a job series was part of HMC's prior 1978 RIF policy. Although it was not explicitly included in the policy that was operative at the time of Roschival's layoff, it appears that at least some HR employees continued using the concept as an interpretive gloss regarding job classifications.

related to one another. Foster explained that to ensure clarity, she created specific titles to show that a job was in a series.[3] She further stated that any jobs with the same title, but differing numbers, were in a series.[4] In classifying a series, Foster also looked at the job responsibilities and duties, MERs, and title, to determine how related they were.

Consistent with this testimony, Roschival argues that her job and Dozier's were part of the same classification—Human Resources Coordinator—and that the difference in their titles reflected progression within the same job series. Indeed, the MERs for HRC1 and HRC do appear to be similar and progressive, with HRC1 carrying all HRC's entry requirements, and more.

Roriex also described a job series as progressive: ". . . Maintenance Mechanic I, Maintenance Mechanic II, Maintenance Mechanic III, the jobs are the same. But when you move along in the progression, you get more responsibility and additional compensation." Roriex Dep., R. 23-8, PID 275. Yet with respect to the HRC and HRC1 positions, Roriex testified that she considered the two positions to be different jobs because of their similar, but distinct, MERs, and further because the job responsibilities differed. When questioned, she did agree that HRC1 encompassed the core responsibilities of HRC, in addition to other responsibilities. In preparing the layoff recommendation for Gavulic, however, she determined that Roschival was alone her in classification because "[t]here was no one else in Human Resources with her same title." *Id.* at PID 277.

---

[3] Foster's examples include: "Health Unit Coordinator Trainee, then Health Unit Coordinator; Accountant, Senior Accountant; Medical Social Worker I, Medical Social Worker II; Maintenance Mechanic I, Maintenance Mechanic II, Maintenance Mechanic III." Foster Dep., R. 23-11, PID 308.

[4] The HRC1 and HRC job descriptions were written in 2013, approximately three years after Foster left HMC, and so she was not in a position to say that she intended these jobs to be a series.

Gavulic testified that she was always under the impression that after the closure of the EHO, Roschival's role, and thus her employment, would be terminated. When she asked Roriex to begin preparing the layoff paperwork, she did so with the assumption that the paperwork would be for Roschival. At the same time, according to Gavulic's testimony, it was Roriex who determined that Roschival was the right employee to lay off and Gavulic relied on that determination.

In sum, although the RIF policy is ambiguous, there is support for Roschival's claim that HMC did not follow it.

**C**

In her deposition, Roschival acknowledged that Gavulic's decision to close the EHO was not racially motivated. Although she does not state it directly, her § 1983 claim follows a theory that (1) HMC was faced with laying off either her or Dozier, (2) Roschival had seniority over Dozier in the same job series and thus Dozier should have been laid off, (3) HMC wanted to retain African-American employees, and (4) so it violated its own RIF procedure and laid Roschival off instead of Dozier.

In reviewing the layoff notice for Roschival, Gavulic did discuss with Roriex whether Roschival or Dozier was the right person to lay off. Roriex testified:

> Q. All right. So there was some discussion between you and Melany [Gavulic], whether it be email or otherwise, as to who was to be laid off; Jamal [Dozier] or Nancy?
> A. She asked me how to handle the layoff for Nancy. Because EHO, they were getting rid of EHO, and we didn't have a place to put Nancy. So it resulted in a layoff.
> Q. So how did Jamal[ Dozier]'s name come up?
> A. I believe she just wanted to know that it wasn't Jamal because of their titles. The titles were different. So I told her, no, it wasn't Jamal.
> Q. So she expressed to you that she did not want to see Jamal lose his job?
> A. Yeah, she did say she don't want—she didn't want anybody to lose their job.
> Q. She expressed to you that she didn't want to see Jamal lose his job?
> A. I believe she did say that. Roriex Dep., R. 23-8, PID 280.

Other than her contention that the RIF policy was misapplied, Roschival acknowledged that she had no knowledge of Gavulic or anyone in HR discriminating against White employees, stating "I don't know why [Gavulic] laid me off." Roschival Dep., R. 23-5, PID 227. Jackson averred, though, that she believed a discriminatory atmosphere may have been at play:

> The one explanation as to why Mr. Dozier was retained over Ms. Roschival is because there was a past practice within the Human Resource Department, and also within the hospital as a whole, that when reorganization/layoffs did occur, special preference was given to African-American employees in their retention. In other words, Hurley Medical Center made great strides to retain African-American employees during reorganization and layoffs. Caucasian employees were not given the same consideration as African-American employees with respect to reorganizations/layoffs within the hospital. Jackson Aff., R. 22-11, PID 168.

However, when she was deposed over a year after making her affidavit, Jackson testified that the pressure to retain African Americans came from HMC's unions, not management. Roschival and Dozier were both non-union employees.

Roschival offered no further evidence of a discriminatory environment, who might have engaged in discriminatory conduct, or when it occurred. Roschival was asked, for example, why she believed a discriminatory atmosphere existed at HMC, but answered by referring to an incident in which HMC was accused of discriminating *against*, rather than in favor of, African-American employees.

## II

We review the district court's grant of summary judgment de novo. *Syzmanski v. Columbia Transp. Co.*, 154 F.3d 591, 593 (6th Cir. 1998).

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Reasonable and justifiable inferences must be viewed in the light most favorable to the non-moving party when deciding whether a grant of summary judgment is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The "mere existence of a

scintilla" of evidence in the non-moving party's favor, however, is insufficient to avoid summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Factual disputes that are "merely colorable" or "not significantly probative" do not defeat a properly supported summary-judgment motion. *Kraft v. United States*, 991 F.2d 292, 296 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 249–50). Rather, a court must look to whether there are *genuine* disputes of *material* fact. A factual dispute is "genuine" when a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 248). A "material" fact affects the outcome of the case. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 575, 581 (6th Cir. 2001) (citing *Anderson*, 477 U.S. at 248).

A public employee's constitutional rights under the Equal Protection Clause are violated when her employment is terminated on account of race. *See* 42 U.S.C. § 1983. She may seek redress under § 1983 against individuals who violate her equal-protection rights, although she bears the "ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).

Absent direct evidence of discrimination, a § 1983 suit must proceed based on circumstantial evidence under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1971); *cf. also Weberg v. Franks*, 229 F.3d 514, 522–23 (6th Cir. 2000) (holding discrimination may be proven by direct or circumstantial evidence in both the Title VII and § 1983 employment-discrimination contexts).

Under *McDonnell Douglas*, the plaintiff has an initial burden of establishing a prima facie case of discrimination. A prima facie case is established when the plaintiff shows that she was "(1) a member of a protected class; (2) discharged; (3) qualified for the position; and (4) that

a similarly situated non-protected person was treated better." *Rachells v. Cingular Wireless Emp. Servs., LLC*, 732 F.3d 652, 661 (6th Cir. 2013) (citation and internal quotation marks omitted). This framework is modified, however, in the context of reverse discrimination and RIFs. As part of the first *McDonnell Douglas* prong, a plaintiff alleging reverse discrimination must "demonstrate 'background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002) (quoting *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985)). In the RIF context, the fourth *McDonnell Douglas* prong is modified as well, and the plaintiff must provide "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Rachells*, 732 F.3d at 661 (quoting *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009)). The plaintiff must provide a "consistent benchmark to gauge" whether she was singled out. *Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 621 (6th Cir. 2006). This means showing disparate treatment compared to (1) all employees who shared the plaintiff's position or an equivalent position and (2) all employees whose positions were to be eliminated and whose terminations were reviewed by the same decision maker.

After the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a reasonable, nondiscriminatory reason for the termination. If the defendant meets this burden, the plaintiff must overcome the explanation by offering evidence that would allow a reasonable jury to conclude that the defendant's explanation was a pretext for unlawful discrimination. *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 779 (6th Cir. 2016). Pretext is established when the plaintiff demonstrates "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the adverse employment

action, or (3) that they were insufficient to motivate [the adverse employment action]."[5] *Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir. 2013) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 460 (6th Cir. 2004)) (internal alterations omitted).

Besides this *Davis* test, a plaintiff may also demonstrate pretext by "offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 391 (6th Cir. 2009) (internal citation and quotation marks omitted). Further, this court has held that deviating from policy may point to pretext, at least in light of other relevant facts. *See Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 422 (6th Cir. 1999) (holding the presence of a number of factors, including "deviat[ion] from . . . normal procedures" that preceded the RIF layoff of the oldest, most highly-rated employee in a peer group permitted a jury finding of age-discrimination pretext).

## III

There is no direct evidence that Gavulic chose to lay Roschival off on account of race. Roschival accordingly must establish a prima facie case under the *McDonnell Douglas* framework. Solely for our analysis, we assume arguendo that Roschival has established a prima facie case, because even on that assumption she cannot meet her burden to show that defendants' proffered legitimate, nondiscriminatory reason for laying her off was pretext to unlawful discrimination.

Gavulic articulates a legitimate, nondiscriminatory reason for Roschival's layoff: the business decision to close the EHO meant that Roschival's role was no longer needed and

---

[5] *Jackson* involved Title VII, but this test also applies to § 1983 discrimination claims. *See Alexander v. Ohio State Univ. Coll. of Soc. Work*, 429 F. App'x 481, 487 (6th Cir. 2011).

Gavulic (who generally did not participate in layoffs and was unfamiliar with administering the RIF procedure) relied on Roriex's conclusion that Roschival was the appropriate employee to lay off.

Plaintiff argues that HRC1 and HRC were in a job series and that the proper procedure was to lay off an employee in the HRC position (here, Dozier) before an employee in the HRC1 position (here, Roschival). Nevertheless, even assuming Roschival is correct that Gavulic and Roriex failed to follow the policy, that would not contradict Roriex's explanation that she subjectively believed that Roschival held a different job classification from Dozier, was the only person in that classification, and thus was the only person to be laid off.

Even if the RIF policy was not properly followed, Gavulic proffered a legitimate, nondiscriminatory reason for Roschival's layoff. To overcome this proffered reason, plaintiff must establish evidence that the reason was pretext to discriminate. The evidence in the record, however, does not raise a genuine dispute whether (1) the proffered reason had no basis in fact, (2) the proffered reason did not actually motivate Roschival's layoff, or (3) that it was insufficient to motivate Roschival's layoff. *See Davis*, 717 F.3d at 491. The events leading to plaintiff's layoff were triggered by Gavulic's business decision to close the EHO and transfer its functions, including those handled by plaintiff, to other entities. Further, this business decision and Roriex's application of the RIF policy, even if flawed, and Gavulic's reliance on Roriex's application of the policy, were sufficient to motivate Gavulic's decision to lay off Roschival. Roschival cannot demonstrate pretext under the *Davis* test.

Roschival may also show pretext by presenting evidence that challenges the reasonableness of Gavulic's decision or that sheds light on whether the proffered reason for her decision actually motivated her. *See Risch*, 581 F.3d at 391. Roschival relies on a failure to

follow the RIF procedure as evidence of pretext. However, even assuming Gavulic personally and knowingly misapplied the RIF policy specifically to spare Dozier's job at the expense of Roschival's, it still would not follow from the record that she favored Dozier because of his *race*. Plaintiff herself testified that she had no knowledge of Gavulic discriminating against White employees, was not aware of anyone in HR (the department she worked in) who did so, and did not know why Gavulic laid her off. This circuit has not held that "deviat[ion] from . . . normal procedures" in itself permits a jury finding of pretext, although it has found it to be one piece of evidence that supports such a finding. *Cf. Skalka*, 178 F.3d at 422. Here, such a finding would not be supported in a context involving two employees with undisputedly different job duties (workers' compensation and new-employee orientation, respectively), a business decision to eliminate one set of job duties, and the layoff of the employee who performed those duties.

**IV**

Even assuming a prima facie case, defendant Gavulic proffers a legitimate, nondiscriminatory reason for laying Roschival off. On the record evidence, Roschival cannot rebut this reason as pretext for unlawful discrimination, and accordingly we **AFFIRM** the grant of summary judgment.