NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0269n.06

**No. 19-1420**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
May 13, 2020
DEBORAH S. HUNT, Clerk

KENYA N. SPRATT,

    *Plaintiff-Appellant*,

v.

FCA US LLC,

    *Defendant-Appellee.*

)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

OPINION

---

Before: MERRITT, CLAY, and BUSH, Circuit Judges.

**CLAY, Circuit Judge.** Plaintiff Kenya Spratt appeals the district court's order granting summary judgment in favor of his former employer, Defendant FCA US LLC, on his race discrimination claim brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a). For the reasons that follow, we reverse the district court's judgment and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

This case arises from Defendant's decision to terminate Plaintiff based on his falsification of bids that were submitted by potential contractors for a large-scale construction project renovating the Chrysler Technology Center in Auburn Hills, Michigan. Plaintiff does not dispute that he falsified the relevant bids. Instead, he argues that Defendant used that falsification as an excuse to illegally terminate him based on his race. Plaintiff contends that if he was not African American, but instead was Caucasian, Defendant would not have terminated him for his conduct.

As evidence of this, Plaintiff points to Defendant's past decision not to fire a similarly situated Caucasian employee who engaged in conduct comparable to Plaintiff's. Based on this differential treatment, Plaintiff argues that a reasonable jury could conclude that Defendant's decision to terminate him was motivated by racial discrimination. For the reasons that follow, we agree.

## A. FCA's Sourcing Process

Prior to his termination in April 2017, Plaintiff Kenya Spratt worked as a Senior Construction Buyer at FCA US. FCA US is a North American car manufacturer, and is a member of the Fiat Chrysler Automobiles family of companies. In his role as Senior Construction Buyer, Plaintiff was responsible for soliciting competitive bids for large-scale construction projects at FCA US and sourcing the projects based on the bids.

Although FCA US did not have written policies for how the sourcing process should be conducted, the standard practice that developed over the years was for the Senior Buyer and the internal client (i.e., the particular department overseeing the respective project) to identify three to four contractors and invite them to bid. Once the initial bids were received, the Senior Buyer would then prepare an initial bid comparison summary, which lists the bids from each contractor based on their respective unit prices (e.g., structural, electrical, plumbing) and item prices (e.g., steel, lighting, sinks). According to Plaintiff, the initial summary sheet "is an analysis tool used to identify variances in the cost of specific units . . . between contractors' bids to determine what clarifications of the job requirements are necessary" before asking the contractors to submit their final bids. (Appellant Br. at 5–6.) The initial summary sheet does not contain the names of the bidding contractors, and it is not used to determine who will be awarded the job.

After the Senior Buyer prepares the initial summary sheet, he shares it with the internal client, and the Senior Buyer and internal client then decide whether or not a clarification meeting is needed. The purpose of a clarification meeting is to review the scope of the project with the contractors in order to ensure that they understand what the project will entail. At this stage, the highest bidder may be eliminated from the competitive process.

Following the clarification meeting, the remaining contractors submit their final bids. The Senior Buyer then prepares a summary of the final bids, and sends that summary to the internal client. Unlike the initial summary sheet, the summary of the final bids includes the contractors' names and identifying information. The internal client and the Senior Buyer use the final summary sheet to determine which contractor will be awarded the job. Usually, the contractor with the lowest bid is successful.

### B. The Museum Project

In late 2016, FCA US decided to renovate the Chrysler Technology Center in Auburn Hills, Michigan (the "Museum Project"). Plaintiff was the Senior Buyer overseeing the renovation. The internal client (the Facilities department) suggested three contractors to participate in the bidding process—Barton Mallow, Walbridge, and Aristeo. Plaintiff suggested a fourth contractor— Roncelli, which was the contractor who originally built the Chrysler Technology Center. All four contractors submitted initial bids.

Based on his experience with the Facilities group in a prior project, Plaintiff was concerned about the integrity of the bidding process for the Museum Project. According to Plaintiff, he had legitimate reasons to believe that someone in the Facilities group was sharing inside information about the bidding process with one of the competing contractors—Barton Mallow. Based on his

suspicion of bias, Plaintiff decided to "massage" some of the numbers in the initial bid summary sheet. (R. 26-3, Pg. ID 222.) He increased some of the line item bids of Barton Mallow and Walbridge, but he did not alter the bids of Roncelli or Aristeo. As a result of his interference with the numbers, the initial bid summary wrongly indicated that the bidder in Column B (Roncelli) had the lowest overall bid. Prior to Plaintiff's adjustment of the numbers, Barton Mallow had the lowest overall bid.

Plaintiff submitted the falsified initial bid summary to Facilities. Based on the summary, Plaintiff and Facilities decided to eliminate Aristeo (the highest bidder both before and after Plaintiff's adjustment of the numbers) and to hold a clarification meeting with the three remaining bidders. At this time, Facilities still did not know which contractor was associated with which bid on the initial summary. (Recall that the initial bid summary does not include the contractors' identifying information in order to prevent bias.) However, around the time of the clarification meeting, the Facilities project manager for the Museum Project—Slavko Stajninger—discovered the actual bid numbers of Walbridge and Barton Mallow. Stajninger discovered Walbridge's bid number because Walbridge accidentally included its name on an e-mail that included its bid information. Stajninger discovered Barton Marlow's bid because Stajninger directly contacted a representative from Barton Marlow and asked him if his was the lowest bid on the initial summary sheet. Based on his answers, Stajninger discovered that some of the numbers on the initial summary sheet had been altered. This triggered an investigation into Plaintiff's conduct.

After the clarification meeting, the three competing contractors submitted their final bids for the Museum Project. Plaintiff compiled the bids into a final bid summary sheet, which was then used to select the contractor who would be awarded the job. Plaintiff did not alter any of the

numbers on the final bid summary sheet. Roncelli had the lowest bid; Barton Mallow was second lowest; and Walbridge submitted the highest bid. Accordingly, Plaintiff recommended that Roncelli be awarded the job. However, the members of the Facilities group decided that they did not want to award the contact to Roncelli, even though Roncelli had the lowest final bid, and instead wanted to award the contract to Barton Mallow. Usually when this occurs (i.e., when the internal client decides not to award the contract to the lowest bidder), FCA US would document that decision and explain its reasoning in its SAP contract system. However, the company did not document why it selected Barton Mallow over Roncelli for the Museum Project.

## C. The Investigation of Plaintiff

In February 2017, FCA US's Business Practices Office ("BPO") began an investigation into Plaintiff's activities related to the Museum Project. As Plaintiff admits, the investigation conclusively determined that Plaintiff falsified certain numbers in the initial bid summary for the Museum Project. The investigation also revealed that Plaintiff had a "personal relationship" with Roncelli's business development leader, Ehrlich Crain. (R. 26-3, Pg. ID 215.) Plaintiff and Crain live in the same neighborhood and both serve on its community housing board. Around the time of the Museum Project, Plaintiff was seeking a variance from the community housing board for an addition to his home. However, Plaintiff maintains that his and Crain's relationship was purely professional and that Plaintiff did not associate with Crain outside of work. The investigation also uncovered that Plaintiff has a personally owned small business that is focused on building residential homes. Plaintiff had attended a residential builders' training course in early 2017 and had wrongly expensed the cost of that course to FCA US.

Following the investigation, FCA US decided to terminate Plaintiff. That termination decision led to the present lawsuit. As noted above, Plaintiff does not deny that he altered some of the numbers on the initial summary sheet. But he maintains that he did so only for the purpose of safeguarding the integrity of the bidding process, given his suspicion that Facilities was biased in favor of Barton Mallow. Accordingly, he contends that his actions were insufficient to motivate his termination, and that the real reason for his termination was his African American race. As evidence of this, he points out that FCA US did not terminate his Caucasian predecessor in the Senior Buyer position—Patrick Bergin—who engaged in similar conduct, but instead of being terminated, Bergin was effectively promoted.

### D. The Investigation of Patrick Bergin

In 2014, FCA US investigated Plaintiff's predecessor, Patrick Bergin, for a number of policy violations: namely, (1) receiving kickbacks from a supplier; (2) forwarding sensitive information to his personal email address; (3) forwarding confidential information to suppliers; (4) selling his personally owned vehicles to suppliers at inflated prices to disguise kickbacks from suppliers; and (5) failing to comply with Defendant's established document management procedures. The essence of FCA US's concern was that Bergin had colluded with Comstock (a Chrysler supplier) to receive kickbacks in exchange for awarding Comstock certain contracts.

Bergin's scheme involved directing Comstock to engage the services of a consultant named Don Tocco and directing Comstock to pay 0.5% of their overall markup to Tocco. Tocco then allegedly paid a portion of the 0.5% back to Bergin in the form of a kickback. The investigation revealed that, during a taped conversation between Bergin and a confidential informant from Comstock, Bergin acknowledged the relationship between Comstock and Tocco, directed the

confidential informant not to make any further payments to Tocco, and asked the confidential informant to delete evidence of Comstock's prior payments to Tocco. However, due to a lack of documentation and conflicting witness statements, the ultimate result of the investigation as to the kickback allegation was considered inconclusive.

The results of the investigation were conclusive as to other allegations against Bergin. First, the investigation concluded that Bergin forwarded a Comstock purchase order to Tocco, in violation of the company's confidentiality policies. The investigation next revealed that, over a five-year period, Bergin sold two personally owned vehicles to two FCA US suppliers, Barton Mallow and Conti, in violation of conflict-of-interest policies. And lastly, the investigation found that Bergin had failed to adhere to company document management procedures by forwarding over 130 business e-mails to his personal e-mail account, and failed to maintain required documentation of much of his work at FCA US, including the mark-up cost calculations relating to dealings with Comstock.

As a result of the investigation, FCA US did not terminate Bergin. Instead, he was involuntarily removed from the Senior Buyer position and transferred to an Engineering Supervisor position at another location. This was a higher paying position for Bergin.

### E. Procedural History

Plaintiff sued FCA US for unlawful employment discrimination in violation of Title VII, arguing that the company's explanation for terminating him due to the falsification of the initial bids was a pretext for race discrimination.[1] *See* 42 U.S.C. § 2000e-2(a). The district court granted

---

[1] Plaintiff also brought other claims against FCA US, which the district court dismissed and which are not relevant to this appeal.

summary judgment in favor of Defendant FCA US. The court found that Plaintiff's alleged comparator, Patrick Bergin, was not similarly situated enough to Plaintiff to allow Plaintiff's claim of employment discrimination based on differential treatment to go before a jury. Plaintiff now appeals the district court's order granting summary judgment in favor of FCA US.

## II. DISCUSSION

This Court reviews a district court's grant of summary judgment de novo. *Payne v. Novartis Pharm. Corp.*, 767 F.3d 526, 530 (6th Cir. 2014). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, the movant bears the initial burden of proving that there is no genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In the present case, Defendant FCA US is the moving party, so it bears the burden of demonstrating its entitlement to judgment as a matter of law.

The *McDonnell Douglas* burden-shifting framework applies to Title VII claims of discrimination that are based on indirect evidence. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). "Under that paradigm, a plaintiff first must establish a *prima facie* case of discrimination." *Id.* The burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the [adverse action.]" *Id.* (alteration in original) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "The plaintiff then is required to prove that the reasons proffered by the defendant were not its true reasons, but were mere pretexts for prohibited discrimination." *Id.*

In the present case, the district court correctly found that Plaintiff established a prima facie case of race discrimination because Plaintiff is a member of a protected class; he was qualified for the position of Senior Buyer; he suffered an adverse employment action when FCA US terminated him; and he was replaced by a Caucasian employee. *See Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (setting forth the elements of a prima facie case of discrimination under Title VII). And FCA US articulated a legitimate justification for terminating Plaintiff based on his falsification of the initial bids for the Museum Project. *See Adamov v. U.S. Bank Nat. Ass'n*, 726 F.3d 851, 854–55 (6th Cir. 2013) (holding that a violation of company policy can be a legitimate reason for terminating an employee). Thus, the only issue on appeal is whether Plaintiff has demonstrated a triable issue as to pretext based on differential treatment between himself and his alleged comparator, Patrick Bergin.

In order to demonstrate a genuine dispute as to pretext based on differential treatment, Plaintiff must set forth some evidence that he was similarly situated "in all of the relevant aspects" to an employee who lacked his protected characteristic and received preferential treatment. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 610 (6th Cir. 2019) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)); *accord, e.g.*, *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019). Generally when determining whether two employees are similarly situated, this Court looks to whether the plaintiff and the alleged comparator (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in substantially identical conduct without differentiating or mitigating circumstances that would distinguish their employer's differential treatment of them. *Redlin*, 921 F.3d at 610 (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). However, we have

consistently said that the *Mitchell* factors are not inflexible requirements, and instead should be considered and applied on a case-by-case basis. *See, e.g.*, *Redlin*, 921 F.3d at 610; *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016).

There is no dispute in this case as to the first and second *Mitchell* factors. Plaintiff has put on evidence that the same person, Jay Wilton, supervised both Plaintiff and Bergin, and had an active role in the decision to terminate Plaintiff and to retain Bergin. Plaintiff and Bergin also held the same position at different times—Senior Construction Buyer in FCA US's Purchasing Department—and were subject to the same standards. Thus, we only need to decide whether Plaintiff has demonstrated a triable issue of fact as to the third *Mitchell* factor: whether Plaintiff and Bergin engaged in substantially identical conduct without differentiating or mitigating circumstances that would sufficiently explain FCA US's differential treatment of them.

FCA US admits that Plaintiff and Bergin were subject to differential treatment for their misconduct, but argues that the differential treatment was justified because each employee's conduct was materially distinct. FCA US points to two distinctions: first, it argues that Plaintiff's misconduct was more serious and his violations of the company's policies more numerous than Bergin's; and second, the results of Plaintiff's investigation were conclusive, while the results of Bergin's investigation were inconclusive. While these arguments may ultimately succeed in persuading a jury that race discrimination did not motivate FCA US's decision to terminate Plaintiff, they do not entitle Defendant to judgment as a matter of law.

We turn first to FCA US's argument regarding the nature of Plaintiff's and Bergin's misconduct. As we have acknowledged before, this Court has never held that a plaintiff and his comparator "must commit exactly the same mistake in order to permit a reasonable inference of

intentional discrimination from their differential discipline." *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 782 (6th Cir. 2016); *see also id.* at 780 (admonishing that the "substantially identical" language of the third *Mitchell* factor "should not be read to increase the weight of [a plaintiff's] burden of proof at the pretext stage"). Instead, "our cases make clear that the relevant inquiry is whether the comparator's conduct was substantially identical 'in all of the *relevant* aspects.'" *Id.* at 782 (emphasis in original) (quoting *Ercegovich*, 154 F.3d at 352). The relevant aspects in this context include the type of misconduct alleged and its relative severity. *See id.* at 780, 783. We gauge the relative severity of the plaintiff's and comparator's misconduct, in part, by looking to its actual and potential consequences. *Id.* at 780.

Plaintiff's and Bergin's alleged misconduct was of the same type. Both of them engaged in wrongdoing that implicated serious concerns "of ethics and trust." (Appellee Br. at 33.) Plaintiff falsified some of the numbers on the initial bid summary, whereas Bergin allegedly colluded with a supplier in order to receive kickbacks in exchange for awarding that supplier certain contracts. In addition, "the circumstances of the mistakes themselves" appear substantially identical: as alleged, both Plaintiff and Bergin intentionally violated well-known company policies. *Jackson*, 814 F.3d at 783. Plaintiff knowingly altered some of the numbers on the initial bid summary, and Bergin knowingly conspired with a supplier to receive kickbacks. If anything, Plaintiff argues that he believed his conduct was in the company's interest, given his claim that he only changed the numbers in order to safeguard the bidding process, whereas Bergin's actions were purely self-interested.

A reasonable juror could also find that Plaintiff's and Bergin's respective wrongdoings were comparably serious based on the actual and potential harm to the company. This is because

Bergin's scheme, if actualized, would have the intended effect of awarding certain contracts to a supplier that otherwise might not have received those contracts. In contrast, construing the facts in Plaintiff's favor, his alteration of the bids had *no* adverse effect on the company because the initial bid summary sheet is never used to determine which contractor will be awarded the project. Instead, Plaintiff changed the numbers only to safeguard the integrity of the bidding process because he suspected that someone from Facilities was sharing information with Barton Mallow (which appears to have been true). Plaintiff did not alter any of the numbers on the final summary sheet, and that is the document that was used to determine who would actually be awarded the contract. Thus, a reasonable juror could find that the actual and potential harm to FCA US from Plaintiff's actions was less severe than the harm caused by Bergin's misconduct.

FCA US responds that Plaintiff was found to have violated more company policies than Bergin, and therefore, FCA US must have considered Plaintiff's misconduct to be more severe. But this Court rejected that exact argument last year in *Redlin v. Grosse Pointe Public School System*. In *Redlin*, the defendant-employer argued that the plaintiff's conduct was less serious than her comparator's because the plaintiff "behaved unethically at least three different times, whereas [her comparator] did so only once." 921 F.3d at 611 (internal quotation marks and record citations omitted). In rejecting that argument as a reason for granting judgment as a matter of law, we found the fact that the plaintiff's same underlying misconduct was "inexplicabl[y]" divided into multiple violations instead of one could itself be evidence of pretext. *Id.* at 612–13. Similarly, we have recognized that "[t]he relative severity of two actions is not determined solely by whether those actions violated the same company rule or policy." *Jackson*, 814 F.3d at 780. Instead, the main considerations that we take into account when considering whether two employees engaged in

"substantially identical" misconduct for purposes of a differential treatment claim are the type, circumstances, and respective severity of the misconduct alleged. *See, e.g.*, *id.* at 780–83; *Johnson*, 942 F.3d at 331–32. While FCA US may ultimately be able to persuade a jury that it considers Plaintiff's misconduct to be more serious than Bergin's, this Court does not weigh the evidence or make credibility judgments when reviewing a summary judgment motion. *E.g.*, *Alspaugh v. McConnell*, 643 F.3d 162, 168 (6th Cir. 2011).

We next turn to FCA US's argument that it treated Bergin more favorably because the results of Bergin's investigation were inconclusive, whereas Plaintiff's investigation was conclusive. While this may be a reason that the jury ultimately rejects Plaintiff's claim of unlawful discrimination, it is not determinative of Defendant's motion for summary judgment. This is especially true under the facts of this case, where there is a genuine question as to whether Bergin's results were inconclusive precisely because of Bergin's misconduct. Based on the investigative report, a reasonable juror could conclude that Bergin purposefully failed to document his transactions and that he asked the supplier to delete evidence of its payments to Tocco.

Our decision is further bolstered by the extent of the dissimilarity in the treatment that Plaintiff and Bergin received. This is not a case like others we have seen where the plaintiff was subjected to termination while the comparator was merely suspended, *see Snyder v. Ohio Dep't of Rehab. & Corr.*, 702 F. App'x 341, 344 (6th Cir. 2017), or where the plaintiff was terminated but the comparator was at least subjected to performance counseling or some other disciplinary action, *see McLaughlin v. Fifth Third Bank, Inc.*, 772 F. App'x 300, 301 (6th Cir. 2019). Instead, Plaintiff alleges that Bergin effectively received a promotion after the investigation into the kickbacks issue because he was placed into a higher paying position. FCA US has not put on any evidence to

dispute this. So, unlike the cases in which a plaintiff and comparator are simply subjected to differential discipline, in this case Plaintiff alleges that his comparator was effectively subjected to favorable treatment for misconduct that was similarly serious. This evidence furthers Plaintiff's argument that there is a triable issue as to pretext. *Cf. Snyder*, 702 F. App'x at 344 (stating that we must consider the similarity in the employees' misconduct as well as any dissimilarity in the discipline received to determine if an inference of pretext is raised).

### III. CONCLUSION

Because Plaintiff has demonstrated a genuine dispute of material fact as to whether he would have been terminated if he were Caucasian instead of African American, we reverse the decision of the district court and remand for further proceedings.